UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| MARK ALLEN BURGESS; ELIZABETH DIAN BURGESS; M.S.B., Minor Child/01; A.N.B., Minor Child /04; E.J.B., Minor Child /15, | CIV 17-4027 |
| Plaintiffs, | |
| vs. | MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT |
| CITY OF SIOUX FALLS; SIOUX FALLS POLICE DEPARTMENT; OFFICER JEFF MACFARLANE, #943; OFFICER IAN BRANCH, #884; OFFICER CHAD WESTRUM, #898, | |
| Defendants. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\*\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Plaintiffs filed this pro se action under 42 U.S.C. § 1983 against Defendants alleging use of excessive force, unlawful arrest, unlawful search and seizure and unlawful questioning of a minor. Defendants filed a Motion for Summary Judgment claiming that the individual defendants are entitled to qualified immunity and that the City of Sioux Falls and the Sioux Falls Police Department cannot be held liable. (Doc. 14.) Plaintiffs oppose the motion. Having carefully considered the entire record, the Court will grant Defendants' motion for summary judgment.

## BACKGROUND

This case arises out of Mark Burgess' ("Burgess") arrest on February 27, 2016. Burgess called 911 after waking up to his wife, Plaintiff Elizabeth Burgess, having a seizure. The Sioux Falls Police Department ("SFPD") and the Sioux Falls Fire & Rescue Department ("SFFR") responded to the 911 call. The responders arrived in the bedroom where the Burgesses were located. Burgess was acting erratically and Officer MacFarlane took action to remove or arrest Burgess which ended up in a struggle involving Burgess and Officers MacFarlane and Westrum. Burgess grabbed a pocket knife. He was sprayed in the face with OC Spray (pepper spray) and was tased before becoming compliant with the officers' commands. Burgess was arrested and charged with two counts of

aggravated assault on law enforcement, obstruction of police and fire personnel, and resisting arrest. He pled guilty to obstructing a law enforcement officer in violation of SDCL 22-11-6.

Plaintiffs allege that the encounter "may have caused long term physical, medical issues, and mental health issues to Mark, Elizabeth, and they're (sic) 3 children who were home at the time of the incident." (Complaint, Doc. 1 at 6.) They assert section 1983 civil rights claims for excessive use of force, unlawful arrest, unlawful search and seizure and unlawful questioning of a minor. Defendant Officers contend that the section 1983 claims against them are barred by the doctrine of qualified immunity. The City and Police Department assert that they are not liable under the facts in this case.

## FACTS

The local rules for this district require that the moving party on a motion for summary judgment submit a statement of the material facts as to which it contends there is no genuine issue to be tried. D.S.D. CIV. LR 56.1(A). The opposing party is required to respond to each numbered paragraph in the moving party's statement of material facts, and to identify any material facts as to which it contends there exists a genuine material issue to be tried. D.S.D. CIV. LR 56.1(B). All material facts set forth in the moving party's statement of material facts are deemed admitted if not controverted by the statement required to be served by the party opposing summary judgment. D.S.D. CIV. LR 56.l(D); *see also On Target Sporting Goods, Inc. v. Attorney General of the United States*, 472 F.3d 572, 574 (8th Cir. 2007). Such rules are intended "to prevent a district court from engaging in the proverbial search for a needle in the haystack." *Libel v. Adventure Lands of America, Inc.*, 482 F.3d 1028, 1032 (8th Cir. 2007) (discussing a similar Iowa Local Rule). "Although pro se pleadings are to be construed liberally, pro se litigants are not excused from failing to comply with substantive and procedural law." *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir. 1984) (citing *Faretta v. California*, 422 U.S. 806, 834-35 n. 46 (1975)).

In this case, Defendants filed a Statement of Undisputed Facts with sixty numbered paragraphs (doc. 15) along with supporting affidavits and exhibits. Plaintiffs Mark and Elizabeth Burgess filed a resistance to the motion for summary judgment (doc. 23), but they did not admit,

deny or qualify each of the facts set forth by Defendants by responding to each numbered paragraph in Defendants' Statement of Material Facts. Burgess' opposition to the motion for summary judgment explains his claims and why he acted the way he did toward the Officers on February 27, 2016, but his description of the confrontation with the Officers does not differ in any significant or material way from the Defendants' descriptions.[1] For these reasons, the Court will set forth the factual allegations from Defendants' Statement of Undisputed Material Facts unless otherwise noted.

1. At around 12:15 a.m. on the night of February 27, 2016, Plaintiff Mark Burgess called 911 after waking up to his wife, Plaintiff Elizabeth Burgess, having a severe medical episode. (Cmplt.; Doc. 1 at 7.) It was later discovered that Ms. Burgess suffered a seizure. (*Id.*) Mr. Burgess explained that he tried to put his cell phone on speaker while he gave his wife CPR, but he was panicking and did not get the speaker option turned on. (Doc. 23 at 1.)

2. Both the Sioux Falls Police Department ("SFPD") and the Sioux Falls Fire & Rescue Department responded to the 911 call. (*Id.*; Aff. of Todd Lowe, Doc. 18).

3. Dispatch advised that CPR was in process on an unknown 31 year-old female and that the female had stopped breathing and was foaming at the mouth. (MacFarlane Aff., Doc. 21 ¶ 6.)

4. SFFR arrived at approximately the same time as Officer MacFarlane, who was the first police officer on scene. (MacFarlane Aff. ¶ 6; Lowe Aff. ¶ 5.)

5. Ms. Burgess was located in an upstairs bedroom. (Lowe Aff. ¶ 6.) She was sitting up and responding to questions from SFFR Captain Lowe. (*Id.*) Ms. Burgess was unsure of why the 911 call had been made. (*Id.*)

6. Officer MacFarlane had followed Captain Lowe up the stairs to the rear bedroom, but was initially blocked from entering the bedroom along with SFFR personnel by Mr. Burgess. (MacFarlane Aff. ¶ 10.)

7. Officer MacFarlane asked Mr. Burgess to exit the room so that SFFR personnel could enter, but Mr. Burgess refused, stating he wanted to remain in the room with his wife. (*Id.* at ¶ 11.) Officer MacFarlane advised Mr. Burgess he could remain in the room, but needed to stay out of the way of the SFFR personnel. (*Id.* at ¶ 12.)

---

[1] The Court has reviewed audio recorded by the body microphones of the defendant officers which both parties submitted.

8. As SFFR attempted to assess Ms. Burgess to determine her medical status, Mr. Burgess continually intervened and demanded that SFFR provide Ms. Burgess with oxygen. (Lowe Aff. ¶ 7.)

9. Mr. Burgess continued to yell instructions at the SFFR personnel about how to treat his wife. (MacFarlane Aff. ¶ 13.)

10. Captain Lowe calmly asked Mr. Burgess to let Ms. Burgess speak so that SFFR could determine her baseline mental status and obtain a patient assessment. (Lowe Aff. ¶ 8.) Mr. Burgess's demeanor became concerning and his responses to additional questions from SFFR personnel became irrational and erratic. (*Id.* at ¶ 9.)

11. Ms. Burgess did not understand why a request for medical treatment had been made. (Lowe Aff. ¶ 10.)

12. Mr. Burgess tried to convey to his wife that she had undergone some sort of medical episode, that she was clenching her firsts and foaming at the mouth, and that she needed medical attention. (MacFarlane Aff. ¶ 16.)

13. In an attempt to obtain information directly from Ms. Burgess, Captain Lowe asked Mr. Burgess to step out of the room so that SFFR personnel could help his wife. (Lowe Aff. ¶ 10.) Instead, Mr. Burgess refused to leave the room and became increasingly aggressive. (*Id.* at ¶ 11.)

14. Captain Lowe asked that a police officer remove Mr. Burgess from the room so that he could interview Ms. Burgess and Mr. Burgess separately. (Lowe Aff. ¶ 11.)

15. At this point, Officer MacFarlane placed his left hand onto Mr. Burgess' right triceps area and asked him politely to leave the room. (Westrum Aff., Doc. 19 ¶ 12.)

16. Mr. Burgess instantly said, "Don't [expletive] touch me," and then clenched his hand up into a fist and pulled it up towards his chest. (Westrum Aff. ¶ 12.)

17. Officer MacFarlane once again asked Mr. Burgess to step just right outside of the bedroom so that we could speak with him. (Westrum Aff. ¶ 13.) Mr. Burgess again showed signs of being combative and asked whether they were going to "do this right here." (*Id.*) Mr. Burgess claims he was upset that no one was getting his wife the help she needed. (Doc. 23 at 2.)

18. Officer Westrum had arrived after Officer MacFarlane. (Westrum Aff. ¶ 7.) Officer Westrum was advised that it was Mr. Burgess' residence, and Officer Westrum had previous interactions with Mr. Burgess. (*Id.* at ¶ 6.) Officer Westrum knew that Mr. Burgess was an individual that officers had previously taken caution with. (*Id.*)

4

19. At this point, Officer Westrum called out code "10-50" to Officer MacFarlane, which is the code used to advise to "proceed with caution." (Westrum Aff. ¶ 14.) Unsure whether Officer MacFarlane heard the code, Officer Westrum yelled out "10-50" a second time. (*Id.*)

20. Officer MacFarlane, however, heard the statement as "10-15," which Officer MacFarlane understood to mean to place Mr. Burgess in handcuffs and detain him. (MacFarlane Aff. ¶ 18.)

21. Officer MacFarlane had already considered detaining Mr. Burgess due to Mr. Burgess' aggressive behavior towards the police officers and the SFFR personnel. (MacFarlane Aff. ¶ 19.)

22. Officer MacFarlane moved forward to detain Mr. Burgess, or at least escort him out of the room, and Mr. Burgess began pushing away from Officer MacFarlane. (MacFarlane Aff. ¶ 20.)

23. Officer MacFarlane pushed Mr. Burgess up against the wall an in attempt to pin him against the far wall. (MacFarlane Aff. ¶ 22.)

24. As Officer MacFarlane pushed Mr. Burgess, Mr. Burgess dropped his left hand out towards to grab an object on the nearby nightstand. (MacFarlane Aff. ¶ 22; Westrum Aff. ¶ 15; Lowe Aff. ¶ 12.)

25. Officer Westrum made his way across the room while Officer MacFarlane continued to maintain control of Mr. Burgess' right arm. (Westrum Aff. ¶ 16; MacFarlane Aff. ¶ 23.)

26. Officer Westrum and Officer MacFarlane then discovered that the item Mr. Burgess grabbed from the nightstand was a pocket knife. (Westrum Aff. ¶ 17; MacFarlane Aff. ¶¶ 23-24.) Mr. Burgess says he grabbed the knife "in an attempt to stop the officers from attacking him." (Doc. 23 at 3.)

27. At this point, Captain Lowe assisted with removing Ms. Burgess from the bedroom, as well as the infant child who was also present in the bedroom. (Lowe Aff. ¶ 13.)

28. As the item was discovered to be a knife, Officer Westrum un-holstered his firearm and aimed it at Mr. Burgess. (Westrum Aff. ¶ 18.)

29. Officer Westrum completed a quick evaluation of the situation and determined there was the potential of Officer MacFarlane being shot, should Officer Westrum need to fire, and holstered his firearm and un-holstered his taser. (Westrum Aff. ¶ 18.)

30. Officer Westrum then aimed his taser at Mr. Burgess. Seeing this, Officer MacFarlane yelled several times for Officer Westrum to "do it," meaning for Officer Westrum to engage Mr. Burgess with his taser. (MacFarlane Aff. ¶ 25.)

31. When Officer Westrum decided not to tase Mr. Burgess, Officer MacFarlane decided to disengage and shoot Mr. Burgess given Mr. Burgess' possession and apparent intent to use the pocket knife. (MacFarlane Aff. ¶ 26.)

32. Officer MacFarlane pushed Mr. Burgess hard into the wall to allow himself time and distance from Mr. Burgess in order to engage Mr. Burgess with lethal force. (MacFarlane Aff. ¶ 26.) After pushing Mr. Burgess into the wall, Officer MacFarlane stepped away from Mr. Burgess towards the foot of the bed, and drew his gun. (*Id.* at ¶ 27.)

33. Officer MacFarlane pointed his gun at Mr. Burgess, and noticed Mr. Burgess' hands rising above his head. (MacFarlane Aff. ¶ 28.) Officer MacFarlane continued to order Mr. Burgess to drop the knife, which he still had clenched in his left hand folded. (*Id.*)

34. Mr. Burgess stood in the corner and Officer MacFarlane asked Mr. Burgess one more time to drop the knife. (MacFarlane Aff. ¶ 29.) Mr. Burgess released the knife, throwing it on the bed. (MacFarlane Aff. ¶ 29; Westrum Aff. ¶ 20.)

35. Officer MacFarlane secured the knife and placed it in his back pocket. (MacFarlane Aff. ¶ 29.)

36. Once the knife was secured, Officer MacFarlane ordered Mr. Burgess to get on the ground. (MacFarlane Aff. ¶ 30.)

37. Mr. Burgess refused and stood with his hands out and stood at the side of the bed. (*Id.*) Officer MacFarlane placed his gun in a low ready position away from Mr. Burgess and withdrew his OC Spray (pepper spray) from his holster as he had seen Officer Westrum still holding Mr. Burgess at taser point. (MacFarlane Aff. ¶ 30.)

38. Officer MacFarlane pointed the OC Spray towards Mr. Burgess and told him to get on the ground. (MacFarlane Aff. ¶ 30.) Mr. Burgess again refused to comply, and Officer MacFarlane sprayed Mr. Burgess with the OC Spray. (MacFarlane Aff. ¶ 31; Westrum Aff. ¶ 21.)

39. The OC Spray had an immediate effect on Mr. Burgess, and Officer MacFarlane continued to order Mr. Burgess to get down on the ground, who had gotten to his knees but had failed to get down on his stomach. (MacFarlane Aff. ¶¶ 32-33; Westrum Aff. ¶ 21.)

40. Officer MacFarlane continued to order that Mr. Burgess get down to the ground, but Mr. Burgess continued to refuse to comply. (MacFarlane Aff. ¶ 33.) At this point, Officer Westrum heard Officer Branch enter the room, so Officer Westrum repositioned himself on the other side of the bed. (Westrum Aff. ¶ 22.)

6

41. After Mr. Burgess' repeated refusal to comply with the commands to get on the floor, Officer MacFarlane decided on to go "hands on" with Mr. Burgess. (MacFarlane Aff. ¶ 34.) Officer MacFarlane moved in to gain control of Mr. Burgess' right arm. (*Id.*)

42. Just as Officer MacFarlane stated the "hands on" request, Officer Westrum observed another set of red dots coming from Officer Branch's taser on Mr. Burgess' person. (Westrum Aff. ¶ 24.) Officer Westrum holstered his taser and engaged Mr. Burgess from the rear. (*Id.*)

43. Mr. Burgess fell back into the wall as Officer Westrum and Officer MacFarlane attempted to gain control of him. (MacFarlane Aff. ¶ 35.) Officer MacFarlane gained control of Mr. Burgess' left arm while Officer Westrum attempted to gain control of Mr. Burgess' right arm. (MacFarlane Aff. ¶ 36; Westrum Aff. ¶ 26.)

44. As Officer MacFarlane held onto Mr. Burgess' left arm, Mr. Burgess pulled it into his chest, attempting to prevent officers from handcuffing him. (MacFarlane Aff. ¶ 37.)

45. Mr. Burgess was ordered several times to stop resisting; however, he continued to tense his muscles and clench his fists. (MacFarlane Aff. ¶ 38; Westrum Aff. ¶ 26; Branch Aff., Doc. 20 ¶ 8.)

46. Officer MacFarlane noticed an exposed area of Mr. Burgess' back left torso and began to deliver closed fist strikes in an attempt to gain pain compliance from Mr. Burgess. (MacFarlane Aff. ¶ 40.)

47. At the same time, Officer Westrum maintained control of Mr. Burgess' left arm, and employed an infraorbital pressure point technique. (Westrum Aff. ¶ 26.)

48. Officer Branch, seeing Mr. Burgess continue to struggle with the officers, utilized his taser to deliver a drive stun to Mr. Burgess' left thigh twice. (Branch Aff. ¶ 9.)

49. Mr. Burgess eventually stated something to the effect of, "I am done," and "I give up" (MacFarlane Aff. ¶ 40; Westrum Aff. ¶ 27.)

50. Officer Westrum then relieved pressure from Mr. Burgess' pressure point, bringing his right arm behind his back and placing handcuffs onto his right wrist. (Westrum Aff. ¶ 27.)

51. Officer MacFarlane then placed a handcuff on Mr. Burgess' left arm, and the officers were able to lock both sets of handcuffs together. (Westrum Aff. ¶ 27; MacFarlane Aff. ¶ 42.) Officer Westrum checked both handcuffs for fit and double locked. (Westrum Aff. ¶ 28.)

52. Mr. Burgess eventually became compliant with all commands the officers were giving, and was escorted out of the residence to receive fresh air to help cool the effects of the OC Spray. (Westrum Aff. ¶ 28.)

53. Knowing there was an infant in the residence, Officer Westrum opened the windows to allow fresh air to enter into the bedroom and closed the bedroom door to keep the OC Spray from making it out of the room to where the infant was currently staying. (Westrum Aff. ¶ 29.)

54. Officer Westrum then went outside to assist Mr. Burgess, who stated he wanted some water to wash his eyes out. (Westrum Aff. ¶ 30.) As requested by Mr. Burgess, Officer Westrum poured the water over Mr. Burgess' eyes to help with the effects of the OC Spray. (*Id.*)

55. After Mr. Burgess was restrained and removed, SFFR personnel provided EMS care for Ms. Burgess. (Lowe Aff. ¶ 15.) Care of Ms. Burgess was eventually transferred to Paramedics Plus. (Lowe Aff. ¶ 16.)

56. EMS Staff advised that Ms. Burgess was showing signs of what someone would show that had recently had a seizure, and stated they were taking her to the hospital. (Westrum Aff. ¶ 31.) Contact was then made with Ms. Burgess' sister who was able to come over to the residence to care for the three children that were still inside the residence. (*Id.*)

57. Mr. Burgess was placed in the back of Officer Branch's patrol vehicle and was transported to the Minnehaha County Jail and lodged for two counts of aggravated assault on Law Enforcement, obstruction of police and fire personnel, and resisting arrest. (Westrum Aff. ¶ 32.)

58. The Officers aver that they did not search the Burgess' residence following the arrest. (Westrum Aff. ¶ 34; Branch Aff. ¶ 12; MacFarlane Aff. ¶ 46.) Plaintiffs contend that the Officers did search the residence.

59. Officer MacFarlane briefly spoke with the Burgess' minor children. He states that he did not interrogate them, but rather had a conversation regarding Mr. Burgess' well-being and medical conditions. (MacFarlane Aff. ¶ 46.) Additionally, Officer MacFarlane asked the children how they were doing, and spoke with them about having another adult come over to watch them. (*Id.*) Plaintiffs assert that it was unlawful for Officer MacFarlane to question the Burgess children.

60. Mr. Burgess eventually pled guilty to obstructing a law enforcement officer in violation of SDCL § 22-11-6, which was a Class 1 misdemeanor. (Engel Aff., Doc. 17 Ex. A.)

In his opposition to summary judgment Burgess explains that his behavior resulted from frustration that paramedics were not giving his wife the treatment he believed was necessary. (Doc. 23.) Burgess asserts that instead of making sure his wife received medical attention, Officer MacFarlane escalated the situation into a violent altercation. Burgess admits he grabbed the knife

during he scuffle with Officer MacFarlane, but argues that he was defending himself. (Doc. 23 at 2-3.)

## DISCUSSION

### A. Claims Brought by Burgess on Behalf of Family Members

As a preliminary matter, Mark Burgess' family members cannot bring federal civil rights claims based on an alleged violation of Mark's civil rights. Courts have held that it is a "well-settled principle that a section 1983 claim must be based upon the violation of plaintiff's personal rights, and not the rights of someone else." *See, e.g., Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990) (holding that son had no liberty interest to be free of emotional trauma suffered from observing allegedly excessive police force which was directed entirely at his father); *Coon v. Ledbetter*, 780 F.2d 1158, 1160-61 (5th Cir. 1986) (holding that a wife who witnessed sheriff's deputies shoot at and wound her husband had no constitutional claim for emotional injuries); *see also Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) (prisoner lacked standing to seek an injunction against mistreatment of other prisoners).

Furthermore, Burgess cannot represent his wife and children in this case. He is not a member of the South Dakota Bar or admitted to practice law before this Court. The United States Code provides that, "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." 28 U.S.C. § 1654. Federal courts allow an individual to proceed pro se under § 1654, but a nonlawyer cannot represent others. *See, e.g., Jones ex rel. Jones v. Corr. Med. Servs., Inc.*, 401 F.3d 950, 952 (8th Cir. 2005) ("a non-attorney . . . may not engage in the practice of law on behalf of others") (citations omitted); *Georgakis v. Illinois State University*, 722 F.3d 1075, 1077 (7th Cir. 2013) ("A nonlawyer can't handle a case on behalf of anyone except himself." (referencing 28 U.S.C. § 1654)); *see also Gross v. United States*, 2009 WL 368664, at *1 (D.S.D. Feb. 13, 2009) (finding a pro se plaintiff was "not permitted to litigate the claims of [an] Estate or beneficiaries of the Estate, with or without their consent, because doing so would amount to engaging in the [unauthorized] practice of law on behalf of others"). Simply put, Burgess cannot represent his family members in this case.

Even if Burgess could seek redress on behalf of his children for Officer MacFarlane's brief questioning of them, as discussed below the Court finds no authority for the proposition that the questioning violated constitutional law, and thus section 1983 does not provide a remedy for that claim.

## B. Summary Judgment Standard

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or by showing that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To avoid summary judgment, "[t]he nonmoving party may not rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quotation omitted).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citing 9A Charles Alan Wright et al., Federal Practice and Procedure, § 2725, at 93-95 (3d ed. 1983)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247-48.

## C. 42 U.S.C. § 1983 Claims

To prevail on a section 1983 claim, Plaintiffs bear the burden of showing that Defendants, acting under color of state law, deprived them of their federal constitutional rights. *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009). Here, there is no dispute that the Officers were acting under color of state law thus the Court will focus on whether or not Plaintiffs have alleged the violation of a clearly established constitutional right. "When we say that a pro se complaint should be given liberal construction, we mean that if the essence of an allegation is discernible, even though

10

it is not pleaded with legal nicety, then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework." *Stone v. Harry*, 364 F.3d 912, 915 (8th Cir. 2004).

Although Plaintiffs' Complaint does not set forth separate counts, Plaintiffs expressly assert violations of Fourth and Fourteenth Amendment rights, and their opposition to summary judgment clarifies that Plaintiffs are alleging claims against all three Officers for unlawful arrest and unlawful search of their house, and for excessive force against Officers MacFarlane and Westrum. Additionally, Plaintiffs assert that Officer MacFarlane unlawfully interviewed the Burgess children. Plaintiffs' pro se pleadings are easily construed to assert constitutional violations.

The Complaint does not specify whether the lawsuit is brought against the Officers in their individual or their official capacities, but the Court will treat the action as one against the Officers in their individual capacities.[2]

Next, the Court must determine whether the doctrine of qualified immunity applies. If it is applicable, qualified immunity will protect the individual Defendants from suit as well as liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("The entitlement is an immunity from suit rather than a mere defense to liability.")

### D. Qualified Immunity

Qualified immunity protects officers from liability in a section 1983 case "unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable

---

[2] Suits against officials in their individual capacities seek to impose personal liability on that official for actions he or she took under color of state law which caused a deprivation of a federal right. *See Clay v. Conlee*, 815 F.2d 1164, 1169–70 (8th Cir. 1987). In contrast, suits against officials in their official capacities require a showing that an official policy or custom caused a constitutional violation. *See id.* at 1170. It is "tantamount to an action directly against the public entity of which the official is an agent." *Id.* Plaintiffs in this case do not allege the existence of a policy or custom as the basis for the alleged constitutional violation by the Officers. Additionally, because the Officers are asserting qualified immunity as a defense, they are treating the case as one brought against them in their individual capacities. *See Rollins v. Farmer*, 731 F.2d 533, 536 (8th Cir. 1984) (qualified immunity "is available only to individuals sued in their individual capacities and not individuals sued in their official capacities.")

person would have known." *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009). When determining whether an official is entitled to qualified immunity at the summary judgment stage, "the official's conduct must be viewed through the prism of Rule 56 – that is, [the court] must take as true those facts asserted by plaintiff that are properly supported in the record." *Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir. 2001). The Court "may not resolve genuine issues of material fact in [the Officers'] favor at the summary judgment stage." *Tatum v. Robinson*, 858 F.3d 544, 552 (8th Cir. 2017).

In the Eighth Circuit, the test for qualified immunity has two parts: (1) whether there is sufficient evidence the officer "violated a constitutional right," and (2) whether the "constitutional right [the officer violated] was so 'clearly established' at the time of the alleged violation that a reasonable officer would have known that his conduct was unlawful." *Rohrbough v. Hall*, 586 F.3d 582, 585 (8th Cir. 2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If the answer to either of the two questions is no, then the officer is entitled to qualified immunity. *Doe v. Flaherty*, 623 F.3d 577, 583 (8th Cir. 2010). The Court must apply the doctrine of qualified immunity in a manner that "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).

1. Have Plaintiffs Established a Violation of a Constitutional Right?

### a. Excessive Force: Officers MacFarlane and Westrum

Burgess claims that Officers MacFarlane and Westrum violated his Fourth Amendment right to be free from excessive force. "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Brown*, 574 F.3d at 496 (citations and internal quotation marks omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This allows "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

When evaluating the reasonableness of an officer's use of force, a court considers "the totality of the circumstances and 'the severity of the crime at issue, the immediate threat the suspect poses to the safety of the officer or others, and whether the suspect is actively resisting or attempting to evade arrest by flight.'" *Smith v. Kan. City, Mo. Police Dep't*, 586 F.3d 576, 581 (8th Cir. 2009) (citation omitted). Force is "'least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public.'" *Johnson v. Carroll*, 658 F.3d 819, 827-28 (quoting *Brown*, 574 F.3d at 499). But when a suspect poses a non-immediate safety threat by repeatedly refusing to comply with officers' reasonable, lawful commands, officers may reasonably use some force to secure compliance. *See Hollingsworth v. City of St. Ann*, 800 F.3d 985, 990 (8th Cir. 2015). An officer's underlying intent or motivation is not relevant to an objective reasonableness analysis. *Graham*, 490 U.S. at 397. "An act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment." *Loch v. City of Litchfield*, 689 F.3d 961, 966 (8th Cir. 2012) (citing *Krueger v. Fuhr*, 991 F.2d 435, 439 (8th Cir. 1993)). Although a de minimis injury does not foreclose an excessive force claim, a court may also evaluate the extent of the suspect's injuries. *See Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011) ("The degree of injury is certainly relevant insofar as it tends to show the amount and type of force used.").

Even viewed in the light most favorable to Burgess, the facts do not support Burgess' contention that Officers MacFarlane and Westrum violated his Fourth Amendment right to be free from excessive force. Burgess called 911 and tried to put his cell phone on speaker while he gave his wife CPR, but he was panicking and did not get the speaker option turned on. The Officers received a report that CPR was in process on a female who had stopped breathing. Officer MacFarlane arrived about the same time as Captain Lowe with Sioux Falls Fire and Rescue. A number of people, including an infant, were in close quarters. Burgess was continually interfering with Captain Lowe's attempts to speak with Ms. Burgess and assess her medical status. Lowe described Burgess' demeanor as concerning and his responses as irrational and erratic. Captain Lowe asked Burgess to step out of the bedroom so they could treat his wife. When Burgess refused to leave the room and became increasingly aggressive, Captain Lowe asked Officer MacFarlane to remove him from the room. In his response to the motion for summary judgment, Burgess admits that he is

13

not a small man.[3] (Doc. 23 at 7.) Burgess argued angrily with Officer MacFarlane and did not comply with his orders. When Officer MacFarlane placed his hand on Burgess' arm and asked him to leave the room, Burgess said, "Don't [expletive] touch me," and clenched his hand into a fist and pulled it up towards his chest. Officer Westrum showed up and Burgess became combative, asking if they were going to "do this right here." Officer Westrum called out the ten code "10-50" twice in order to advise Officer MacFarlane to proceed with caution. Officer MacFarlane heard "10-15" which he understood to mean to place Burgess in handcuffs and detain him. When MacFarlane moved to grab Burgess, Burgess picked up a pocket knife from the nightstand. Even though he eventually dropped the knife, Burgess continued to physically resist the Officers and refused to comply with their commands. Burgess' behavior went well beyond yelling and cursing. He took threatening action towards Officers MacFarlane and Westrum, and then resisted their efforts to restrain and handcuff him. During the attempts to subdue him, MacFarlane sprayed Burgess in the face with pepper spray. Burgess got down on his knees but refused to lay down on the ground, so MacFarlane struck him in the back left torso with his fists and Officer Westrum used a pressure point technique. When Officer Branch arrived during the altercation he ushered all of the civilians out of the room and, after seeing the attempts to control Burgess failing, Officer Branch used his taser to deliver two drive stuns to Burgess' left thigh. Burgess finally became compliant with commands and was escorted out of the house. The Court concludes that the Officers' use of force was objectively reasonable under the circumstances.

Though the degree of injury is not dispositive of an excessive force claim, *see LaCross v. City of Duluth,* 713 F.3d 1155, 1159 (8th Cir. 2013), the Court notes that the record is devoid of evidence showing Burgess suffered any serious or residual physical injury. Although Burgess was sprayed directly in the face with pepper spray and suffered some pain and discomfort, Burgess has not presented evidence that the pepper spray caused more than temporary pain and discomfort. In addition, while a taser delivers a "painful and frightening blow" that can render "even the most pain tolerant individuals utterly limp," *McKenney v. Harrison*, 635 F.3d 354, 362 (8th Cir. 2011), the Eighth Circuit has held that in the absence of any long-term effects, the use of a taser does not inflict

---

[3] The arrest report Burgess attached to his opposition shows he is 6'1" and 260 pounds. (Doc. 23.)

serious injury. *LaCross,* 713 F.3d at 1158. Burgess submitted a medical record showing he went to the emergency room on March 2, 2016, complaining of jaw pain from his February 27 encounter with the police, but the tests were negative and he left the emergency room with directions to take Tylenol and ibuprofen. All of this further supports this Court's finding that the Officers' use of force was reasonable under the circumstances where even Burgess admits he was noncompliant with Officer MacFarlane's reasonable, lawful commands to step outside the bedroom, and then grabbed a pocket knife and continued to physically resist the Officers.

In summary, the Court finds that there are no genuine issues of material fact regarding whether the amount and degree of force used by Officers MacFarlane and Westrum surpassed what was objectively necessary in the situation. Thus, Burgess has failed to establish a violation of his Fourth Amendment right to be free from excessive force and Officers MacFarlane and Westrum are entitled to qualified immunity on the excessive force claim.

### b. Unlawful Arrest: Officers MacFarlane, Westrum and Branch

Burgess claims that Officer MacFarlane should not have initiated his arrest after mishearing Officer Westrum's use of the code "10-15" which means proceed with caution. As explained above, Officer MacFarlane thought Officer Westrum said "10-50" which means arrest the subject. Burgess faults Officer Westrum for not clearing up the misunderstanding because there was no probable cause to arrest him at that time. Burgess claims Officer Branch also violated the law by charging Burgess with two counts of Aggravated Assault on Police Officers.

"The Fourth Amendment, as applied to the States through the Fourteenth Amendment, requires that an officer have probable cause before making a warrantless arrest." *Veatch v. Bartels Lutheran Home,* 627 F.3d 1254, 1257 (8th Cir. 2010). "Probable cause exists when a police officer has reasonably trustworthy information that is sufficient to lead a person of reasonable caution to believe that the suspect has committed or is committing a crime." *Id.* When reviewing probable cause, the court examines the totality of the circumstances "as set forth in the information available to the officers at the time of arrest." *Fisher v. Wal-Mart Stores, Inc.,* 619 F.3d 811, 816 (8th Cir. 2010). The Supreme Court has held that it is constitutionally reasonable for a police officer to arrest

a person for even a minor offense if the officer has probable cause to believe that the person has committed a crime. *Virginia v. Moore*, 553 U.S. 164, 171 (2008).

Viewing the facts in the light most favorable to Burgess, the Court finds that MacFarlane had probable cause to arrest Burgess. SDCL 22-11-6 provides that any person who, "by using or threatening to use violence, force, or physical interference or obstacle, intentionally obstructs, impairs, or hinders the enforcement of the criminal laws or the preservation of the peace by a law enforcement officer . . . or intentionally obstructs emergency management personnel acting under color of authority, is guilty of obstructing a law enforcement officer. . . ." SDCL 22-11-6. The question before the Court is not whether Burgess was actually obstructing or interfering with the police or emergency personnel, but rather whether an objectively reasonable officer could conclude that he was.

Burgess explains that he just wanted someone to give his wife medical assistance, but Burgess does not dispute the evidence showing that Officer MacFarlane had reason to believe Burgess was interfering with the first responders' ability to assist Ms. Burgess and that Burgess needed to be removed from the room. Burgess began interrupting Captain Lowe, yelling and acting erratically. Captain Lowe even asked Officer MacFarlane to remove Burgess from the room so he could talk to Ms. Burgess. Burgess does not dispute that he refused to comply with Officer MacFarlane's requests that he exit the room. When Officer MacFarlane touched Burgess, Burgess yelled a profanity and made a fist. The situation was escalating and a reasonable officer could have concluded that Burgess was interfering with his duties and obstructing his efforts to the secure the safety of the scene, in addition to obstructing the first responders' ability to assist a patient in an emergency. The fact that Officer MacFarlane misheard the ten code stated by Officer Westrum does not change the analysis. Even if that was the sole reason Officer MacFarlane attempted to restrain Burgess, "[a]n act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment." *Loch*, 689 F.3d at 966.

As for Officer Westrum, he did repeat and attempt to clarify the 10-15 code, but by then the scuffle was occurring and Burgess was grabbing a knife. Under all of the circumstances Officer

Westrum faced, a reasonable officer could have believed that Burgess was committing a crime and should be taken into custody.

The unlawful arrest allegations against Officer Branch for charging Burgess with assault of a police officer likewise fail to establish a constitutional violation. There is no doubt that Burgess was actively and strenuously physically resisting the efforts of Officers MacFarlane and Westrum when Officer Branch arrived on the scene. Burgess' physical resistance to arrest rapidly escalated into a more serious crime of assaulting officers. When Burgess began to physically resist and particularly when he grabbed the knife off the nightstand, there was probable cause to arrest him and charge him with assault of police officers.

In summary, the seizure and arrest of Burgess was reasonable and his claim that the arrest was contrary to the Fourth and Fourteenth Amendments to the United States Constitution is barred by qualified immunity.

### c. Unlawful Search of Residence: Officers MacFarlane, Westrum and Branch

Burgess claims the Officers unlawfully searched his residence after his arrest. The Fourth Amendment protects the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. With few exceptions, the Fourth Amendment prohibits the warrantless entry of a person's home to make an arrest or to conduct a search. *Kyllo v. United States*, 533 U.S. 27, 31 (2001). "A search within the meaning of the Amendment 'occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.'" *United States v. Roby*, 122 F.3d 1120, 1123 (8th Cir. 1997) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

Burgess' evidence consists of audio recordings of Officers MacFarlane and Westrum talking about possible video footage (doc. 23 at 8-9), and a recording of Officer Westrum and another officer discussing where Burgess' knife was (doc. 23 at 9). The audio recordings, however, do not support a finding that the officers conducted an unconstitutional search, but rather that they were making sure any evidence of the crime scene was secured. Burgess admitted that he was not present during the alleged search. *See* Doc. 23 at 4 (explaining that once he was handcuffed the Officers "took him out

of the room and outside to fresh air" where he was attended to by paramedics.) Burgess provides no evidence beyond surmise to substantiate his unlawful search claim. His suspicions are insufficient to give rise to a constitutional claim.

### d. Unlawful Interview of Burgess Children: Officer MacFarlane

Finally, Burgess asserts that Officer MacFarlane unlawfully interviewed his children after Burgess' arrest. Burgess describes the interview:

> Macfarlane asked the children M.S.B. /01 and A.N.B. /04 questions about wether (sic) they knew if their parents were using drugs, and if they had been fighting or drinking. The children responded by saying that no drugs are used in the home, however M.S.B. /01 said that his mom was on medication for a surgery she had the day before. He wasn't sure what medication she was on. MacFarlane also wanted to know if the parents have any history of mental illness.

(Doc. 23 at 4-5.) Officer MacFarlane describes his talk with the Burgess children:

> Following Mr. Burgess's arrest, I briefly spoke with the minor children downstairs at Mr. Burgess's residence. My interaction with the children was not an interrogation, but rather, a conversation regarding their father's well-being and medical conditions. Additionally, I asked the children how they were doing, and spoke with them about having another adult come and watch them.

(MacFarlane Affidavit at ¶ 46.)

Burgess does not explain what constitutional right he believes was violated by Officer MacFarlane. There are no facts to indicate Officer MacFarlane's interaction with the Burgess children amounted to a seizure of the children in violation of their Fourth Amendment rights. A person has been "seized" within the meaning of the Fourth Amendment if, in view of all of the circumstances surrounding the incident, a reasonable person would not have believed that he was free to leave. *United States v. Mendenhall,* 446 U.S. 544, 554 (1980); *United States v. Grant,* 696 F.3d 780, 784 (8th Cir. 2012). Under this standard, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Grant,* 696 F.3d at 784 (quoting *Florida v. Bostick,* 501 U.S. 429, 434 (1991)). Here, the material facts surrounding Officer MacFarlane's talk with the Burgess children are not in dispute. He spoke with them very briefly about their well-being and the well-being of their parents. Under these circumstances, the Court cannot conclude that the

Burgess children were "seized" with the meaning of the Fourth Amendment, or that any other constitutional violation occurred.

Even if it was an unconstitutional seizure of the children, Officer MacFarlane would still be entitled to qualified immunity. The children's mother was having a medical emergency and their father was in custody. A reasonable officer would not have understood that talking to the children was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citation omitted) (holding "[f]or a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right") (internal quotes and citation omitted). MacFarlane's actions, therefore, are shielded by the doctrine of qualified immunity.

### 2. Clearly Established Constitutional Right- Excessive Force Claim

Having determined that Burgess failed to establish a violation of a constitutional right, the Court does not need to reach the second prong of the qualified immunity analysis. *Fields v. Abbott*, 652 F.3d 886, 894 (8th Cir. 2011) (clearly established law prong not reached based on finding no constitutional claim proved). However, the Court finds that, even assuming a Fourth Amendment excessive force violation occurred, on these facts the Officers are nonetheless entitled to qualified immunity because a reasonable officer would not have known their conduct violated clearly established law.

To constitute clearly established law, the "existing precedent must have placed the . . . constitutional question beyond debate" and must "'squarely govern[ ]' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018) (first quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017); then quoting *Mullenix v. Luna*, 136 S. Ct. 305, 310 (2015)).

> Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.

*Kisela*, 138 S. Ct. at 1153. "Such specificity is especially important in the Fourth Amendment context, where . . . '[i]t is sometimes difficult for an officer to determine how the relevant legal

doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). This specific-case requirement ensures that officers are not exposed to liability without a "fair and clear warning of what the Constitution requires." *City & Cty. Of S.F. v. Sheehan*, 135 S. Ct. 1765, 1776–77 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 746 (2011) (Kennedy, J., concurring)); *see Kisela*, 138 S. Ct. at 1152.

In the present case, the evidence demonstrates that Burgess angrily argued, refused to comply with commands, and actively resisted the Officers' efforts to restrain him, and he continued to do so even after being pepper sprayed and punched. Only after Officer Branch gave Burgess two stuns with a taser did he stop struggling and start complying. At the time of the incident, no clearly established law existed which would have informed the Officers that their use of force was excessive and in violation of the Fourth Amendment under the situation that they faced. *See Mullenix*, 136 S. Ct. at 308 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate") (quoting *Ashcroft v. al-Kidd*, 563 U.S. at 741).

For this additional reason that the law was not clearly established, the Court finds that Defendants MacFarlane and Westrum are entitled to qualified immunity and summary judgment on the excessive force claim.

### E. Claims Against City of Sioux Falls and Police Department[4]

Defendants argue that the claim against the City of Sioux Falls and its police department must be dismissed, since there is no evidence which would support a claim under *Monell v. New York City Department of Social Services*, 436 U.S. 658, 694 (1978). In that case, the United States Supreme Court held that a civil rights complaint against a municipality or its agent must allege (1) the existence of a custom or policy of the municipality which is of such longstanding as to have the force of law; and (2) that one of the municipality's employees violated the plaintiff's civil rights while acting pursuant to this custom or policy. 436 U.S. at 691-695.

---

[4] The Court will treat the City and its police department as a single entity for purposes of section 1983 liability. *See, e.g., Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 n. 4 (3d Cir. 1997).

Burgess has not responded by pointing to evidence of any relevant municipal or departmental custom or policy. Instead, he argues that the municipality is liable because it is in charge of the hiring and training of the police officers. (Doc. 23 at 13.) This fails to state a viable claim for several reasons.

First, liability does not attach simply because the municipality employs the officers. *Monell*, 436 U.S. at 694. Liability under section 1983 for a governmental entity must be based upon an official custom, policy, or practice of the city that causes the constitutional deprivation, *Monell*, 436 U.S. at 690–94; *Granda v. City of St. Louis*, 472 F.3d 565, 568 (8th Cir. 2007), or is so pervasive among non-policymaking employees of the municipality so "as to constitute a custom or usage with the force of law." *Granda*, at 568 (quoting *Kuha v. City of Minnetonka*, 365 F.3d 590, 603 (8th Cir. 2003)). Nowhere has Burgess alleged a policy or custom which caused his alleged constitutional violations. Accordingly, he has failed to state a claim for municipal liability. *See Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007) ("a plaintiff must identify a governmental 'policy or custom that caused the plaintiff's injury' to recover from a governmental entity under § 1983") (citation omitted).

Second, as explained above, Burgess' allegations fail to state a claim for an underlying constitutional violation by Officers MacFarlane, Westrum or Branch. Because Burgess has failed to state a viable claim for any constitutional deprivation in connection with the events that occurred here, the City cannot be liable. *See Abbott v. City of Crocker*, 30 F.3d 994, 998 (8th Cir. 1994) ("The City cannot be liable . . . whether on a failure to train theory or a municipal custom or policy theory, unless [an officer] is found liable on the underlying substantive claim.").

## CONCLUSION

The Court grants qualified immunity to Officers MacFarlane, Westrum or Branch on all of Plaintiffs' claims because they failed to present evidence that Defendants violated their constitutional rights. In addition, Plaintiffs have failed to establish a constitutional violation by the City. Accordingly,

IT IS ORDERED that Defendants' Motion for Summary Judgment, Doc. 14, is granted.

Dated this _____ day of May, 2018.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

By: _____ , Deputy
(SEAL)